BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division
DAVID C. LACHMAN (Cal. Bar No. 261711)
Assistant United States Attorney
National Security Division
NISHA CHANDRAN (Cal. Bar No. 325345)
Assistant United States Attorney
Major Frauds Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-5564/2429
    Facsimile: (213) 894-2927
    E-mail:   david.lachman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 24-00127-JFW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT CHENGUANG GONG |
| v. | |
| CHENGUANG GONG, | Hearing Date: November 17, 2025 Hearing Time: 8:00 a.m. Location:    Courtroom of the    Hon. John F. Walter |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys David C. Lachman and Nisha Chandran, hereby files its Sentencing Position for defendant CHENGUANG GONG.

//

//

This Sentencing Position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 30, 2025        Respectfully submitted,

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

_____/s/_____
DAVID C. LACHMAN
NISHA CHANDRAN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                PAGE

TABLE OF AUTHORITIES....................**Error! Bookmark not defined.**

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.................................................1

II.   FACTUAL BACKGROUND..........................................3

      A.   Defendant's Theft of Critical National Security
           Technologies and its Impact............................3

      B.   Defendant's Systematic Theft of National Security
           Technologies from Victim Company 1.....................4

      C.   The Impact of Defendant's Theft on Victim Company 1.......7

      D.   Pattern of Theft Across Multiple Employers...............7

      E.   PRC Talent Programs and Intent to Benefit Foreign
           Government.............................................8

      F.   The Whereabouts of Hard Drive 1 Remain Unknown..........10

III.  SENTENCING GUIDELINES CALCULATION..........................13

IV.   ARGUMENT...................................................13

      A.   National Security Implications Require a High-End
           Sentence..............................................13

      B.   Multiple Aggravating Factors Support a High-End
           Sentence..............................................15

      C.   Deterrence Is Critical in This Case....................17

           1.   General Deterrence...............................17

           2.   Specific Deterrence..............................20

           3.   No Mitigating Factors Exist that Warrant Leniency...20

      D.   A Substantial Fine Is Appropriate......................22

      E.   Restitution...........................................23

V.    CONCLUSION.................................................24

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    INTRODUCTION**

3       Defendant CHENGUANG GONG ("defendant") systematically stole
4  product designs for advanced integrated circuits and infrared sensors
5  developed for the U.S. military from his employers for over a decade
6  and sought to provide those technologies to the People's Republic of
7  China ("PRC").  In 2023, defendant secured employment as a senior
8  engineer at a research and development laboratory in the Central
9  District of California ("Victim Company 1"), which was developing
10  infrared sensor technologies that are essential to America's next-
11  generation, space-based surveillance systems and U.S. military
12  aircraft's defensive capabilities.  Almost immediately, defendant set
13  out to steal the entire product designs for Victim Company 1's
14  infrared sensor systems, which are designed to detect nuclear missile
15  launches, track ballistic and hypersonic missiles, and protect
16  military aircraft from heat-seeking threats.  Defendant methodically
17  transferred the product designs to personal hard drives, including
18  after giving notice that he was leaving for one of Victim Company 1's
19  few direct competitors.  Victim Company 1 discovered the transfers,
20  fired defendant, and notified the Federal Bureau of Investigation.

21       Defendant's conduct is particularly egregious because his
22  deliberate and systematic theft of Victim Company 1's trade secrets
23  is not an isolated incident; it represents the culmination of a long
24  pattern of stealing proprietary technology from U.S. companies to
25  benefit the PRC's military.  From at least 2014 to 2022, defendant
26  repeatedly applied to PRC Talent Programs, seeking over $5.6 million
27  in funding while explicitly emphasizing the military applications of
28  the stolen technologies.  In his own words, the technology he stole

from his employers would "get rid of the United States blockade of China's product lines" in strategic technologies.

The national security implications of defendant's theft are profound. A hard drive containing the blueprints for Victim Company 1's most sensitive infrared sensor technologies remains missing. When confronted about the theft, defendant fabricated increasingly implausible stories to explain its disappearance. In adversarial hands, this drive could enable foreign nations to replicate Victim Company 1's technologies, which are the fruit of years of research and tens of millions of dollars in investment by the company and the U.S. Department of Defense. As the head of Victim Company 1's infrared sensor business stated, while the potential economic harm to the company is concerning, he is "more concerned if this technology was obtained by other nations, since it would be dangerous to national security."

Throughout this investigation, defendant has demonstrated a complete lack of credibility, lying repeatedly to Victim Company 1, FBI agents, and Probation. Even after pleading guilty, he continues to minimize his conduct by offering false exculpatory statements flatly contradicted by the evidence.

A sentence at the high end of the Guidelines range of 57 months' imprisonment is necessary and appropriate. The aggravating factors are substantial: defendant's decade-long pattern of stealing proprietary technology from U.S. companies; his stated motive to advance China's military capabilities -- as he wrote in a 2019 email, he took "risks" because he worked for "a US military company" and thought he "could do something for [China's] high-end military integrated circuits"; his systematic efforts to profit from the

stolen technologies by seeking millions in funding from PRC Talent
Programs; his targeting of Victim Company 1 for its advanced
technologies; and the ongoing threat from the unrecovered hard drive
containing Victim Company 1's most sensitive sensor designs.
Additionally, a high-end Guidelines fine of $200,000 is warranted
given the egregious conduct and defendant's substantial assets of
over $2.4 million.

## II.  FACTUAL BACKGROUND

### A.  Defendant's Theft of Critical National Security Technologies and its Impact

Victim Company 1 has invested heavily for over a decade in
developing advanced infrared sensor systems designed to detect
missile launches, track incoming missiles and drones, and enable U.S.
military aircraft to engage in defensive countermeasures.  (Ex. A
(Victim Impact Statement) at 1; PSR ¶ 14.)  Victim Company 1 is one
of very few companies in the world that develop large-format, high-
sensitivity focal plane array integrated circuits, and the designs
are closely held trade secrets.  The Anaheim and Serrano projects
were funded by the U.S. Department of Defense and Victim Company 1's
aerospace industry partners, with Victim Company 1 spending years and
tens of millions of dollars developing these technologies.  (PSR
¶ 40.)

The **Anaheim Technology** allows U.S. surveillance satellites to
obtain high-definition views of entire hemispheres and is radiation-
hardened for operating in harsh space environments.  From a military
perspective, Anaheim allows satellites to detect missile launches and
track missile flight paths by monitoring emitted energy.  The designs
defendant stole contain over 2,000 unique trade-secret design

components necessary to manufacture, model, and operate the sensor. (Ex. A at 2; PSR ¶ 15)

The **Serrano Technology** utilizes high dynamic range with time-of-flight capabilities to track threats in low visibility environments and analyze how quickly a threat is approaching. This technology enables aircrafts to detect incoming heat-seeking missiles or drones and provides necessary information to evade or neutralize those threats – which helps ensure the safety of U.S. military aircraft. (Id.)

The computer assisted design ("CAD") files for the Serrano and Anaheim Technologies are singularly designed for military purposes. Because of the extremely high costs to design and produce these technologies, as well as their size, they have no viable commercial uses. Since these files describe the methods, designs, techniques, processes, specifications, testing, and manufacturing of these technologies, it would be extremely damaging to Victim Company 1 economically if obtained by competitors. The greater national security concern, however, is that this technology could be obtained by foreign state actors and, in turn, used against U.S. military operations.

B.    **Defendant's Systematic Theft of National Security Technologies from Victim Company 1**

Defendant was employed at Victim Company 1 from January 30, 2023, through April 26, 2023 -- less than three months. (PSR ¶¶ 14, 24.) On his first day, he attended mandatory training regarding his obligation to protect Victim Company 1's proprietary information, which specifically prohibited employees from connecting personally owned portable electronic devices and removable media to work

4

laptops.  Defendant signed a form acknowledging his participation in that training on January 31, 2023.  (PSR ¶ 22.)

Despite this explicit warning, within weeks of starting at Victim Company 1, defendant began systematically stealing Victim Company 1's most valuable technologies.  From March 31 to April 25, 2023, he transferred hundreds of proprietary files to three personal digital devices:  a flash drive and two external hard drives ("Hard Drive 1" and "Hard Drive 2").  (PSR ¶¶ 16-17.)  On April 26, 2023, Victim Company 1 discovered defendant actively downloading files during his exit interview and immediately terminated his employment.

Defendant needed to engage in a complex, multi-step process to exfiltrate the proprietary designs for the Anaheim and Serrano Technologies.  The files are only accessible on Victim Company 1's network through a virtual machine and require specific scripts and commands granted to designated employees.  For defendant to download these files and copy them to a Windows-based computer, he needed to: access the virtual machine, log into the Unix system, invoke commands, run requisite scripts to compress and archive the product libraries, utilize file transfer protocols, and then copy the files to external devices.  (Plea Agreement ¶ 11; PSR ¶ 17.)  There was no legitimate business reason for these transfers.  If defendant genuinely needed to access his work files from home, he could have accessed Victim Company 1's Unix environment remotely using his work laptop.  (PSR ¶ 26(b); PSR ¶ 21.)  Or he could have saved the files locally to his work laptop.  His choice to exfiltrate files to personal storage devices demonstrates that he intended to misappropriate Victim Company 1's trade secrets.

The scope of defendant's theft was extensive:

- **March 31, 2023**: Copied approximately 760 files to Hard Drive 1, including approximately 185 .bz2 archive files containing the entire product and user libraries for the Anaheim and Serrano Technologies -- as well as information allowing a semiconductor foundry to manufacture the Anaheim and Serrano products.  (PSR ¶ 18.)

- **April 5, 2023**: Copied six archive and CAD design files to a flash drive containing the blueprints to the Serrano Technology.  (PSR ¶ 19.)

- **April 6, 2023**: Transferred approximately 939 files to Hard Drive 2, including the blueprints to the Serrano Technology and at least two files containing designs for the Mechanical Technology.  (PSR ¶ 19.)

The design files defendant stole included the entire product roadmaps for the Anaheim and Serrano Technologies.  Many of the files defendant copied included documents marked "PROPRIETARY," "EXPORT CONTROLLED," "FOR OFFICIAL USE ONLY," and "PROPRIETARY INFORMATION." (PSR ¶ 20.)  A competitor or a foreign state actor could duplicate Victim Company 1's work and replicate the Anaheim and Serrano Technologies, or even improve on aspects of Victim Company 1's work. (PSR ¶ 40.)

Victim Company 1 recovered the flash drive from defendant's workstation, and defendant later provided Hard Drive 2 to his attorney.  Hard Drive 1, which contained the complete blueprints to the Anaheim and Serrano Technologies, has never been recovered.  (PSR ¶¶ 24, 41.) [1]

---

[1] Defendant wrongly suggests that he returned Hard Drive 1, which contained the complete product and user libraries for the Anaheim and Serrano Technologies, to his lawyer.  Hard Drive 1 is a Western Digital drive with the serial number WXM1E974PT0U.  Defendant gave Hard Drive 2, with the serial number WX32DC2R90LF, to his lawyer, but Hard Drive 1 remains missing.  (See, e.g., Plea Agreement ¶ 11 at p. 10:18-20.)

**C.    The Impact of Defendant's Theft on Victim Company 1**

During the investigation and prosecution of the theft of its trade secret, Victim Company 1's employees have spent approximately 1,000 staff hours identifying the stolen files, analyzing compromised trade secrets, notifying relevant stakeholders, and assessing the potential impact to its programs -- all diverting resources from Victim Company 1's core national security mission.  Despite these efforts, Victim Company 1 faces ongoing uncertainty.  Defendant has refused to reveal what happened to Hard Drive 1, which contained the blueprints for the Anaheim and Serrano Technologies, or whether he shared information with competitors or foreign adversaries.  This creates "a lingering cloud of uncertainty" -- Victim Company 1 may never know if it has lost its competitive advantage or, worse, whether a foreign government now possesses its trade secrets and can replicate or identify weaknesses in U.S. national security systems. Making matters worse, defendant began stealing within weeks of joining Victim Company 1 and after previously attempting to market stolen trade secrets to PRC Talent Programs, suggesting he intentionally targeted the company and its national security technologies. (Ex. A at 1, 3-4.)

**D.    Defendant's Pattern of Theft Across Multiple Employers**

Defendant's theft from Victim Company 1 was not an isolated incident.  Rather, it was part of defendant's decade-long pattern of targeting and stealing from each of his employers.

From approximately 2009 to May 2014, defendant worked as an integrated circuit design manager for a U.S. information technology company in Santa Clara, California ("Victim Company 2").  (Plea Agreement ¶ 11.)   During this time, defendant stole thousands of

proprietary files, including the tape-out designs for manufacturing Victim Company 2's export-controlled analog-to-digital converters ("ADCs").  (Id.)  Law enforcement recovered these files from devices seized from defendant's residences in 2023 and 2024 -- nearly a decade after his employment ended.  (PSR ¶¶ 27-28.)

Then, from May 2015 to October 2019, defendant was an image sensor design manager for the U.S. subsidiary of an international defense, aerospace, and security company in San Jose, California ("Victim Company 3").  (Plea Agreement ¶ 11.)  While employed by Victim Company 3, defendant worked on the development and design of low-light image sensors.  (Id.)  Without authorization, defendant stole proprietary and trade secret files from Company 3's servers, including the trade-secret designs and tape-out files for ultra-low noise sensors developed for extreme low-light imaging for use in military applications.  (Id.)  These files were also seized from defendant's devices by FBI in May 2023 and February 2024, years after defendant's employment ended.  (PSR ¶ 29.)

As set forth below, defendant marketed trade secrets stolen from Victim Companies 2 and 3 to PRC Talent Programs, demonstrating that he did not possess the stolen files for a legitimate work purpose; rather, he maintained a personal archive of stolen intellectual property, with military uses, for future exploitation.

**E.   Defendant's Submission of Applications to PRC Talent Programs**

The PRC established Talent Programs to identify individuals with expert skills and knowledge that would aid in transforming the PRC's economy, including its military capabilities.  The PRC government rewards recruits with significant financial and social incentives.

Through these programs, the Chinese government recruits Western-educated individuals to conduct research on behalf of the PRC in furtherance of its strategic national development goals.  (PSR ¶¶ 30-33.)

From 2014 to 2022, while employed at U.S. technology companies, defendant submitted numerous applications to PRC Talent Programs seeking over $5.6 million in funding.  (PSR ¶¶ 34-38.)  In his applications, defendant used graphics taken from materials belonging to his U.S. employers and explicitly emphasized the military application of the stolen technologies he was proposing to provide. Defendant's Talent Program applications include:

- **August 2014 (Hangzhou Talent Program):** Proposing 16-bit ADC converters, defendant explained that in "national defense" and "military" settings, high-performance ADCs "directly determine the accuracy and range of radar systems."  He stated that the export restrictions on high-performance were a strength of his proposal, noting that such ADCs were "completely monopolized by major American manufacturers" and "[i]ncluded on the U.S. embargo list."  He stated his project would "get rid of the United States blockade of China's product lines in this category" and bring the PRC's ADC development to the same level as U.S. technology companies.  (PSR ¶ 35.)

- **January 2017 (38th Research Institute of CETGC):** Defendant reiterated military utility of high-performance ADCs, explaining that increased accuracy would result in increased radar detection distance.  He emphasized there were "almost no" Chinese companies capable of developing such export-controlled products.  (PSR ¶ 36.)

- **September 2019 (while employed at Victim Company 3):** Defendant traveled to China for a Talent Program conference.  In an email to a recruiter afterward expressing frustration at no response, he stated he "took the risk (because I work for [Victim Company 3], a US military company) thinking that I could do something for [China's] high-end military integrated circuits."  This explicitly acknowledges taking a "risk" by attempting to provide technology from a "US military company" to benefit

9

"China's high-end military integrated circuits."  (PSR ¶ 37.)

- **2020 (talent competition semi-finals):** Defendant submitted a video presentation including high-performance ADCs and footage showing a high-performance 4K resolution CMOS sensor with a visible model number.  The FBI confirmed defendant had stolen the designs for these 4K resolution CMOS low-light sensors from Victim Company 3.  He stated his product extensions included low-light and night-vision dual-use CMOS image sensors for military night-vision goggles. (PSR ¶ 38.)

The FBI confirmed that defendant had stolen the designs for the 370 MSPS ADC from Victim Company 2 -- the very technology he was proposing to develop for China's military applications.

This pattern over nearly a decade -- stealing trade secrets from U.S. technology companies and then marketing those stolen designs in presentations to Chinese government officials to obtain funding – shows that defendant knew and intended that his theft would benefit the PRC and its military capabilities.

## F.    The Location of Hard Drive 1 Remains Unknown

Throughout this investigation, defendant has demonstrated a lack of genuine acceptance of responsibility through repeated lies.  Most critically, his fabrications about Hard Drive 1 -- which contains the complete blueprints for Victim Company 1's Anaheim and Serrano Technologies and has never been recovered -- make it impossible to determine whether these highly sensitive national security technologies have been compromised.

When Victim Company 1 interviewed defendant on April 26, 2023, he initially denied using personal storage devices to transfer files. When confronted with evidence, he changed his story multiple times: first denying any transfers, then admitting to only three documents, then claiming only public documents, before finally stating someone

made him "curious" and he transferred files to read at home.  He
admitted knowing it was wrong to take Victim Company 1's proprietary
information and that he had signed an acknowledgment form.  (PSR ¶
25.)

     During FBI interviews in May 2023, defendant initially denied
multiple times owning any personal drives besides the Verbatim Flash
Drive, and then explicitly denied having any Western Digital hard
drives -- the very drives containing Victim Company 1's most
sensitive technologies.  (PSR ¶ 44.)  He lied about his Talent
Program applications, stating he applied only once in 2019 when he
had applied numerous times between at least 2014 to 2022.  He falsely
claimed he did not offer technology that had military applications --
directly contradicted by his proposals repeatedly emphasizing
military uses and by the FBI's confirmation that he was marketing
designs stolen from Victim Companies 2 and 3 in his presentations.
(PSR ¶ 44.)

     In June 2023, when FBI agents asked defendant about the Western
Digital hard drives, he invented the "gas station theft" story,
claiming a hard drive was stolen from his bag at a gas station.  He
claimed he downloaded files to read at home because he was too busy
during the day -- but this explanation is refuted by the fact that
defendant could have accessed the files on his work laptop if he
genuinely needed to work remotely.  (PSR ¶¶ 21, 45.)

     By August 2023, defendant claimed to FBI agents that Amazon sent
him an empty hard drive box, but he never contacted Amazon to report
this issue.  He later claimed that a Victim Company 1 employee stole
a hard drive from his bag during his April 26, 2023 termination
interview.  Finally, he claimed that on his way home, a woman at a

11

gas station rifled through his unlocked car when he went to the restroom and stole the hard drive and $800 in cash from his bag. (PSR ¶¶ 46-47.)

Even during his August 2025 interview with Probation, defendant continued providing false explanations, again claiming he downloaded files to work from home at night -- contradicted by the fact that he could have accessed Victim Company 1's systems remotely using his work laptop and would not have been able to edit the files outside of the company's proprietary design environment.  (PSR ¶ 48.)

Due to defendant's lack of credibility and repeatedly false explanations, we cannot know what happened to the stolen designs. Hard Drive 1 remains missing to this day.  Given defendant's pattern of stealing trade secrets from multiple U.S. contractors over more than a decade, his repeated applications to Chinese government Talent Programs emphasizing military applications, his use of stolen designs in presentations to Chinese officials, and his fabricated stories about the drives' disappearance, the inference is clear:  defendant either provided Hard Drive 1 to foreign adversaries or concealed or destroyed the drive to prevent discovery of what he did with the files.

This extensive pattern of lies -- particularly about a missing hard drive containing some of the country's most sensitive military technologies -- demonstrates that defendant has not genuinely accepted the seriousness of his conduct.  While he pleaded guilty in the face of overwhelming evidence, he continues to lie about the most critical aspect of his offense: what happened to the stolen technologies he transferred to Hard Drive 1.

## III. SENTENCING GUIDELINES CALCULATION

The parties stipulated to the following Guidelines calculation, which Probation adopted:

| | | |
|---|---|---|
| Base Offense Level | 6 | U.S.S.G. § 2B1.1(a)(2) |
| Loss Enhancement | +18 | U.S.S.G. § 2B1.1(b)(1)(J) |
| Benefit a Foreign Government, Instrumentality, or Agent Enhancement | +4 | U.S.S.G. § 2B1.1(b)(14)(B) |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1(a), (b) |
| Zero-Point Offender | -2 | U.S.S.G. § 4C1.1 |
| **TOTAL OFFENSE LEVEL** | **23** | |

With a Criminal History Category of I, the resulting Sentencing Guidelines Range is 46 to 57 months.  (PSR ¶¶ 52-67; Plea Agreement ¶ 13.)

## IV.  ARGUMENT

A sentence at the high end of the Guidelines range of 57 months, a fine of $200,000, and restitution of $594,459 to Victim Company 1 is necessary and appropriate to comply with 18 U.S.C. § 3553(a) purposes of sentencing.  The extraordinary seriousness of this offense, combined with multiple aggravating factors, supports a sentence at the high end of the applicable range.

### A.    National Security Implications Require a High-End Sentence

The first § 3553(a) factor -- "the nature and circumstances of the offense" -- requires a sentence that reflects the seriousness of the offense and promotes respect for the law.  18 U.S.C. § 3553(a)(1), (2)(A).

Defendant stole product designs for highly specialized military systems developed through years of research and tens of millions of dollars in U.S. government and private investment.  The **Anaheim**

13

**Technology** detects missile launches and tracks ballistic and hypersonic missiles in space-based surveillance systems, which is essential to America's next-generation strategic defense capabilities.  If adversaries obtain the Anaheim Technology, they could identify weaknesses, develop countermeasures to evade detection, or replicate the technology for their own military capabilities.  (Ex. A at 2.)  Likewise, the **Serrano Technology** enables U.S. military aircraft to detect incoming heat-seeking missiles and engage in defensive countermeasures.  It is crucial to ensuring safety of American pilots and survivability of U.S. military aircraft in combat.  If this technology falls into adversarial hands, they could develop tactics to defeat these countermeasures, use underlying principles to improve their own weapons systems targeting U.S. aircraft, or implement similar technology in their own fighter planes.  (Id.)

Defendant's transfer of the design files to Hard Drive 1 gave him the entire roadmap of the technologies' life cycle.  These files could enable a competitor to outbid Victim Company 1 incurring research or development costs, or worse, allow a foreign nation to duplicate the technologies.  As Victim Company 1 stated: "Mr. Gong's actions have potentially handed our adversaries a roadmap to these technologies, jeopardizing years of innovation and possibly exposing vulnerabilities in our national security systems."  (Id. at 1.)  If adversaries have access to this information, "they could use that information to their military advantage and identify weaknesses in our national security systems."  (Id. at 3-4.)

In sum, defendant systematically targeted U.S. technology companies, including defense contractors, for over a decade,

accumulating stolen trade-secret designs for some of America's most sensitive military systems. He actively sought to market stolen trade-secret designs to China, explicitly emphasizing their military application in his Talent Program proposals. Most alarmingly, he has concealed the whereabouts of Hard Drive 1, which contains the blueprints for space-based missile defense technologies, leaving open the very real possibility that these have been compromised or may be compromised in the future.

**B.   Multiple Aggravating Factors Support a High-End Sentence**

While the Guidelines provide a framework, several aggravating factors support a sentence at the high end of the applicable range.

First, the parties stipulated to a loss of $5.6 million based on the funding defendant sought in PRC Talent Program applications. As Probation noted, "there is insufficient information as to the actual loss" and "absent more information, the intended loss stipulated in the Plea Agreement is used." (PSR ¶ 56.) The true magnitude of the harm, however, supports a sentence at the high end of the Guidelines range. The actual harm encompasses not only the potential harm to Victim Company 1 but also the incalculable harm to national security if these technologies are compromised. (Ex. A; PSR ¶¶ 54-56.) These considerations support a sentence at the high end of the Guidelines range.

Second, defendant's decade-long pattern of recidivist conduct across multiple employers strongly supports a sentence at the high end of the Guidelines range. He did not commit a single isolated offense but made it his practice to steal trade secrets from every defense contractor that employed him -- including Victim Company 1 (2023), Victim Company 2 (2009-2014), and Victim Company 3 (2015-

2019).  He retained these materials for years, maintaining a personal library of stolen intellectual property, and repeatedly attempted to monetize them through PRC Talent Programs from 2014 to 2022.  (PSR ¶¶ 27-38.)  Defendant's theft from Victim Company 1 was not an aberration; it was a continuation of criminal conduct spanning over a decade.  While he qualifies as a zero-point offender because he was not previously caught, defendant's pattern of sophisticated, repeated theft targeting U.S. technology companies using his unique employee access, is a significant aggravating factor supporting a high-end sentence.

The evidence also suggests defendant may have specifically targeted Victim Company 1 with premeditated intent to steal its most sensitive technologies.  His employment lasted less than three months, yet within weeks he began systematically downloading thousands of files far beyond his job duties, including files that predated his arrival and were unnecessary for his management responsibilities.  (PSR ¶¶ 14-26.)  He continued until he was caught actively downloading files and had already secured employment at one of Victim Company 1's principal competitors.  (PSR ¶¶ 40, 105.)

Third, Hard Drive 1, which contained the blueprints for Victim Company 1's most sensitive technologies, represents an ongoing national security threat.  This drive has never been recovered, and its whereabouts remain unknown.  Rather than coming clean, defendant fabricated a series of implausible stories to explain its disappearance.  Therefore, "it is unknown whether the trade secrets stored in [Hard] Drive 1 . . . are still in Gong's possession or whether he has already disseminated their contents to others," and "[t]he long term potential damages to [Victim Company 1] and the

16

implications of potential damage to national defense security are unknown."  (PSR ¶ 41.)

This ongoing uncertainty represents a continuing threat to national security that extends beyond the completed theft.  Every day Hard Drive 1 remains unaccounted for is another day adversaries may possess blueprints to critical missile defense and aircraft protection systems.  This aggravating factor -- the defendant's concealment of the most sensitive stolen materials and the resulting ongoing national security risk -- strongly supports a sentence at the high end of the Guidelines range.

These three aggravating factors collectively demonstrate that this case warrants a high-end sentence of 57 months.

**C.   Deterrence Is Critical in This Case**

Under 18 U.S.C. § 3553(a)(2)(B), the Court must consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct."  Both general and specific deterrence weigh heavily in favor of a high-end sentence.

### 1.   General Deterrence

General deterrence is particularly important in cases involving theft of trade secrets with national security implications.  The threat of Chinese economic espionage targeting U.S. defense technologies represents one of the most serious national security challenges facing the United States.  As former FBI Director Christopher Wray stated in 2020, China's efforts to steal American technology represent "the greatest long-term threat to our nation's information and intellectual property, and to our economic vitality." Remarks by FBI Director Christopher Wray at DOJ China Initiative Conference (Feb. 6, 2020).  The scope and persistence of this threat

17

1  cannot be overstated.  According to the FBI, it opens a new

2  counterintelligence case involving China approximately every 12

3  hours, spanning all 56 field offices and involving efforts to steal

4  American technology across virtually every industry sector.

5       PRC Talent Programs are a key component of China's

6  comprehensive, whole-of-government strategy to acquire foreign

7  technology and expertise.  The Chinese government uses these programs

8  to "recruit Western-educated individuals to work and conduct

9  technical and scientific research on behalf of the PRC and in

10  furtherance of the PRC's strategic national development goals,"

11  promising significant financial and social incentives to

12  participants.  (PSR ¶¶ 30-33.)

13       This case exemplifies the threat posed by PRC Talent Programs.

14  Defendant worked for prominent U.S.-based technology companies for

15  more than a decade, systematically stealing trade secrets from each

16  of them.  He retained these stolen materials, building a personal

17  archive of some of America's most sensitive technologies.  He then

18  applied to multiple Chinese government Talent Programs from 2014 to

19  2022, seeking over $5.6 million in funding to develop technologies

20  for China's military using the stolen trade secrets.  He explicitly

21  emphasized in his proposals that the technologies had military

22  applications for "national defense" and would help China "get rid of

23  the United States blockade" in strategic technologies subject to U.S.

24  export controls.  The FBI confirmed that he possessed the complete

25  design libraries necessary to manufacture the technologies he

26  marketed to the PRC Talent Programs.

27       A high-end Guidelines sentence in this case serves multiple

28  critical deterrent purposes.  <u>First</u>, it will signal to employees of

18

U.S. technology companies and defense contractors that trade secret theft will result in meaningful punishment, not a slap on the wrist. Many scientists and engineers working in the defense sector may receive approaches from foreign talent recruiters offering substantial financial incentives.  A high-end sentence will provide a concrete incentive for individuals to report such contacts to their employers and to U.S. counterintelligence authorities rather than to participate in illegal technology transfer schemes.  A lenient sentence, by contrast, would signal that the potential rewards of participating in such programs outweigh the risks of prosecution.

Second, a high-end Guidelines sentence will demonstrate to the Chinese government and other foreign adversaries that the United States takes protection of its national security technologies seriously.  Foreign intelligence services carefully monitor prosecution outcomes and sentencing results to assess the risks their recruited agents face and the risk they face when investing in agents in the U.S.  A lenient sentence would signal that the United States does not view technology theft as a priority worthy of substantial punishment.

Third, a high-end Guidelines sentence will protect American companies and the American economy by deterring the theft of intellectual property that cost billions of dollars to develop.  When employees steal trade secrets with impunity or face only minimal consequences, it undermines the incentive for companies to invest in research and development, knowing that their competitors or foreign adversaries can simply steal the results of that investment.

A low-end Guidelines sentence in this case would send precisely the wrong message to employees of defense contractors, foreign talent

recruiters, and the Chinese government.  It would fail to deter others who might consider defendant's course of conduct.  It would embolden foreign adversaries who are actively recruiting American scientists and engineers.  And it would fundamentally undermine the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

In contrast, a sentence at the high end of the Guidelines range of 57 months sends the appropriate message: that theft of America's most sensitive military technologies will be punished accordingly. Such a sentence provides the general deterrence that is essential to protecting U.S. national security.

### 2.   Specific Deterrence

Specific deterrence -- protecting the public from future crimes by this defendant -- also favors a substantial sentence.  Defendant's pattern over more than a decade demonstrates he views trade secret theft as an acceptable means of personal enrichment.  He has shown no genuine remorse and consistently lied when confronted.  Defendant's extensive pattern of deception demonstrates he has not internalized wrongfulness of his conduct.  Even after his guilty plea, he continues to minimize his actions and fabricate false explanations. (PSR ¶ 48.)  This lack of appreciation for the severity of his conduct suggests a risk of future criminal conduct if not adequately deterred.  A high-end sentence of 57 months is necessary to provide specific deterrence and protect the public.

### 3.   No Mitigating Factors Exist that Warrant Leniency

The government anticipates defendant may argue for leniency based on various mitigating factors.  None warrant a low-end Guidelines sentence.

First, while defendant he has no prior criminal history, this does not justify leniency.  His pattern of theft across three employers over a decade demonstrates his lack of criminal history is simply a function of not having been caught earlier, not an indication of good character.  The zero-point reduction has already been applied, resulting in a two-level decrease.  No further reduction is warranted.

Second, defendant may argue he accepted responsibility by pleading guilty.  The government agreed to recommend a three-level reduction, which has been applied.  (PSR ¶¶ 64-65.)  However, genuine appreciation for the severity of his conduct would include honestly explaining what happened to the missing hard drive and accepting that for almost a decade he sought to profit from trade secret theft and aid China's military.  He has done neither.  The reduction already accounts for his guilty plea; his lack of genuine remorse does not warrant additional reduction.

Third, defendant may claim he downloaded files to work from home or because he was too busy during the workday.  This explanation has no merit.  If defendant genuinely needed to access his work files from home, he could have accessed the Victim Company 1's Unix environment remotely using his work laptop.  (PSR ¶¶ 21, 26(b).)  There was no legitimate reason to transfer the CAD files to personal devices.  Moreover, he downloaded files completely outside his scope of duties and files that belonged to other employees, and he retained stolen trade secrets from previous employers for years after employment ended, incorporated them in folders labeled for his startup company, and marketed the technologies to the PRC Talent

Programs, demonstrating that the theft was not work-related.  (PSR ¶¶
28-29.)  This explanation is simply not credible.

Finally, defendant may argue his conduct did not result in
actual harm because there is no evidence the stolen technologies were
provided to the PRC or other foreign adversaries.  This argument
fails for multiple reasons.  Defendant's intent is clear from his
years of marketing stolen U.S. technologies to PRC Talent Programs to
benefit the PRC's military.  The hard drive containing the most
sensitive technologies remains missing.  Despite defendant's
increasingly implausible explanations, the only reasonable inference
is that he either provided this drive to foreign actors or destroyed
it to conceal his actions.  Regardless, an unaccounted-for hard drive
containing sensitive military trade secrets poses serious national
security concerns.  Finally, the theft itself inflicted substantial
harm on Victim Company 1: response costs, damaged customer
relationships, and ongoing uncertainty about whether its competitive
advantages and national security technologies have been compromised.
(Ex. A at 3-4.)

For these reasons, no mitigation exists that would warrant a
sentence below the high end of 57 months.

### D.   A Substantial Fine Is Appropriate

The government recommends that the Court impose a fine of
$200,000, based on the need for the fine to serve as both punishment
and deterrence.  Defendant has total assets of approximately $2.4
million, including a home in San Jose and brokerage/bank accounts
valued at approximately $1.3 million.  (PSR ¶¶ 111-112.)  He recently
sold a townhouse for $1,350,000, receiving proceeds of $250,000. (PSR
¶ 112.)  Probation assessed that defendant "has substantial assets

and has the ability to make lump sum payments toward his restitution and fine obligations," noting "a payment of a fine would serve to offset the cost of supervision."  (PSR ¶ 118.)  Given defendant's substantial assets, a fine of $200,000, at the high end of the Guidelines range, reflects the seriousness of the offense, serves as meaningful punishment, and provides deterrence commensurate with his financial circumstances.

### E.   Restitution

Under the plain language of the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, the sentencing court must order that the defendant make restitution to the victim of the offense.  The MVRA requires, in the case of property offenses, return of the property taken or its value, § 3663A(b)(1), and in all cases reimbursement to the victim of "expenses incurred during participation in the investigation or prosecution of the offense." Id. § 3663A(b)(4); Lagos v. United States, 584 U.S. 577, 580 (2018); United States v. Brody, No. 23-4358, 2025 WL 1864959, at *3 (9th Cir. July 7, 2025); United States v. Eyraud, 809 F.3d 462, 467 (9th Cir. 2015).  Here, the return of the stolen files appears impossible, and their value is in the tens of millions of dollars.  Based on information provided by Victim Company 1 regarding the costs it incurred during the investigation and prosecution of the offense, the government requests that the Court order restitution in the amount of $594,459 to be paid to Victim Company 1.

//

//

1  **V.    CONCLUSION**

2       For the foregoing reasons, the United States respectfully

3  requests that the Court sentence defendant to 57 months'

4  imprisonment, impose a fine of $250,000, order restitution of

5  $594,459, and impose a mandatory special assessment of $100.  This

6  sentence is necessary to reflect the extraordinary seriousness of

7  defendant's offense conduct, which poses grave and ongoing threats to

8  national security.

9   Dated: October 30, 2025          Respectfully submitted,

10                                   BILAL A. ESSAYLI
                                     First Assistant United States
11                                   Attorney

12                                   IAN V. YANNIELLO
                                     Assistant United States Attorney
13                                   Chief, National Security Division

14
                                            /s/
15                                   _____
                                     DAVID C. LACHMAN
16                                   NISHA CHANDRAN
                                     Assistant United States Attorneys

17                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
18

19

20

21

22

23

24

25

26

27

28

The undersigned, counsel of record for the United States, certifies that this brief contains 6,416 words, which complies with the word limit of L.R. 11-6.1

Dated: October 30, 2025          Respectfully submitted,

                                 BILAL A. ESSAYLI
                                 First Assistant United States
                                 Attorney

                                 IAN V. YANNIELLO
                                 Assistant United States Attorney
                                 Chief, National Security  Division


                                 _____/s/_____
                                 DAVID C. LACHMAN
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA